## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SARAH SHOURD, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 22-cv-1309 |
| | ) | |
| THE GOVERNMENT OF THE ISLAMIC REPUBLIC OF IRAN, | ) ) | |
| | ) | |
| Defendant. | ) | |
| | | |
| JOSHUA FATTAL, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 22-cv-2110 |
| | ) | |
| THE GOVERNMENT OF THE ISLAMIC REPUBLIC OF IRAN, | ) ) | |
| | ) | |
| Defendant. | ) | |
| | | |
| SHANE BAUER, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 22-cv-2294 |
| | ) | |
| THE GOVERNMENT OF THE ISLAMIC REPUBLIC OF IRAN, | ) ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION
September 30, 2024 [Dkt. ##16, 17, 17]

Before the Court are three motions for default judgment from three, consolidated

cases brought against the government of the Islamic Republic of Iran ("Iran"): *Shourd*, No.

22-cv-1309; *Fattal*, No. 22-cv-2110; and *Bauer*, No. 22-cv-2294. I **GRANT IN PART**
and **DENY IN PART** (only insofar as damages awarded differ from plaintiffs' requests)
each motion and award damages consistent with Appendix A to this memorandum opinion.

## I.   BACKGROUND

These three cases stem from the unjust imprisonment of Sarah Shourd, Shane Bauer,
and Josh Fattal by Iranian forces at Evin prison, in Tehran, Iran. In *Shourd*, the plaintiffs
are victim Sarah Shourd and her mother, Patricia "Nora" Shourd. *See* Compl., *Shourd*, No.
22-cv-1309 (May 12, 2022) [Dkt. #1]. In *Fattal*, plaintiffs are victim Joshua "Josh" Fattal,
his parents, Jacob and Laura Fattal, and his brother, Alexander "Alex" Fattal. *See* Compl.,
*Fattal*, No. 22-cv-2110 (July 18, 2022) [Dkt. #1]. In *Bauer*, plaintiffs are victim Shane
Bauer, his parents, Al Bauer and Cindy Fisher, and his sisters, Nicole Lindstrom and
Shannon Bauer. *See* Compl., *Bauer*, No. 22-cv-2294 (Aug. 3, 2022) [Dkt. #1]. All eleven
plaintiffs (collectively, "Plaintiffs") are U.S. citizens.[1]

Plaintiffs served Iran under 28 U.S.C. § 1608(a)(4) via diplomatic channels. *See*
Return of Service, *Shourd*, No. 22-cv-1309 [Dkt. #11]; Return of Service, *Fattal*, No. 22-
cv-2110 [Dkt. #12]; Return of Service, *Bauer*, No. 22-cv-2294 [Dkt. #12]. But Iran has

---

[1] Pls.' Proposed Findings of Fact and Conclusions of L. in Supp. of Their Mot. for Default J. ("Shourd Br.") Ex. 1, Decl. of S. Shourd, *Shourd*, No. 22-cv-1309 [Dkt. #15-2] ¶ 1; Shourd Br. Ex. 2, Decl. of N. Shourd, *id.* [Dkt. #15-3] ¶ 1; Pls.' Proposed Findings of Fact and Conclusions of L. in Supp. of Their Mot. for Default J. ("Fattal Br.") Ex. 1, Decl. of Joshua "Josh" Fattal, *Fattal*, No. 22-cv-2110 [Dkt. #16-2] ¶ 1; Fattal Br. Ex. 2, Decl. of L. Fattal, *id.* [Dkt. #16-3] ¶ 1; Fattal Br. Ex. 3, Decl. of Jacob Fattal, *id.* [Dkt. #16-4] ¶¶ 1–2; Fattal Br. Ex. 4, Decl. of A. Fattal, *id.* [Dkt. #16-5] ¶ 1; Pls.' Proposed Findings of Fact and Conclusions of L. in Supp. of Their Mot. for Default J. ("Bauer Br.") Ex. 1, Decl. of Shane, *Bauer*, No. 22-cv-2294 [Dkt. #16-3] ¶ 1; Bauer Br. Ex. 2, Decl. of C. Fischer, *id.* [Dkt. #16-4]; Bauer Br. Ex. 3, Decl. of A. Bauer, *id.* [Dkt. #16-5] ¶ 1; Bauer Br. Ex. 4, Decl. of N. Lindstrom, *id.* [Dkt. #16-6] ¶ 1; Bauer Br. Ex. 5, Decl. of Shannon Bauer, *id.* [Dkt. #16-7] ¶ 1.

not appeared in any of these three cases.  Accordingly, the Clerk entered default as to Iran

in each case.  *See* Clerk's Entry of Default, *Shourd*, No. 22-cv-1309 [Dkt. #14]; Clerk's

Entry of Default, *Fattal*, No. 22-cv-2110 [Dkt. #15]; Clerk's Entry of Default, *Bauer*,

No. 22-cv-2294 [Dkt. #15].  Plaintiffs' motions for default judgment followed.

## II.    LEGAL STANDARD

"[W]hen the adversary process has been halted because of an essentially

unresponsive party," a court can enter a default judgment under Federal Rule of Civil

Procedure 55(b)(2).  *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting *H.F.

Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir.

1970)).  Plaintiffs must establish FSIA claims "by evidence satisfactory to the court."  28

U.S.C. § 1608(e); *see* Fed. R. Civ. P. 55(d) (detailing the same standard).  The Court can

"accept as true the plaintiffs' uncontroverted evidence."  *Elahi v. Islamic Republic of Iran*,

124 F. Supp. 2d 97, 100 (D.D.C. 2000).  Additionally, the Court can "determine precisely

how much and what kinds of evidence the plaintiff must provide."  *Han Kim v. Democratic

People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014).  Courts "ha[ve] an

unusual degree of discretion over evidentiary rulings in a FSIA case," and evidence may

fall beneath the standard normally required.  *See, e.g.*, *Owens v. Republic of Sudan*, 864

F.3d 751, 785 (D.C. Cir. 2017), *vacated & remanded on other grounds sub nom. Opati v.

Republic of Sudan*, 590 U.S. 418 (2020).  This discretion covers admitting expert

testimony, something "of crucial importance" in cases such as these when it "is difficult or

impossible to obtain" from an absent sovereign "firsthand evidence and eyewitness

testimony."  *Id.* at 785–87.

The Court can enter default judgment when "(1) [it] has subject matter jurisdiction over the claims, (2) personal jurisdiction is properly exercised over the defendant[], (3) the plaintiffs have presented satisfactory evidence to establish their claims against the defendants, and (4) the plaintiffs have satisfactorily proven that they are entitled to the monetary damages they seek." *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 75 (D.D.C. 2017).

## III.   FINDINGS OF FACT

Based on the records in these cases, including affidavits and expert reports submitted with Plaintiffs' motions, *see Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 212 (D.D.C. 2012); *Owens*, 864 F.3d at 785–87, and previous cases concerning the same actors, *see Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 109 n.6 (D.D.C. 2005), the Court can make the following findings of fact.[2]

### A.   Imprisonment of Shourd, Bauer, and Fattal in Iran

In July 2009, Sarah Shourd and Shane Bauer travelled with friends from their home in Damascus, Syria, to Iraqi Kurdistan. Decl. of S. Shourd ¶¶ 5–7. With Josh Fattal, they visited Ahmad Awa, a waterfall that was a popular tourist destination, with a plan to hike and camp overnight before meeting another friend. Decl. of S. Shourd ¶ 8; Decl. of Josh Fattal ¶¶ 11–13; Decl. of Shane Bauer ¶¶ 7–9. After several hours of hiking the following morning, they spotted a uniformed soldier with a gun who motioned for the three Americans to approach. Decl. of S. Shourd ¶ 11; Decl. of Josh Fattal ¶ 15; Decl. of Shane

---

[2] Further findings of fact specific to individual claims and damages are detailed *infra*.

Bauer ¶ 10.  They complied and were led to more soldiers wearing uniforms bearing the Iranian flag.  Decl. of S. Shourd ¶¶ 11–12; Decl. of Josh Fattal ¶¶ 15–16; Decl. of Shane Bauer ¶¶ 10–11.  A soldier explained that they had been in Iraq when the soldier flagged them down, but now they had crossed into Iran.  Decl. of Josh Fattal ¶ 17.  The soldiers let Shane make a phone call, but threatened to shoot him if he tried to leave.  Decl. of S. Shourd ¶ 14; Decl. of Josh Fattal ¶ 18; Decl. of Shane Bauer ¶ 13.  The three prisoners were forced into a vehicle and were kept in various locations for a couple days until they arrived at Evin prison in Tehran.  Decl. of S. Shourd ¶¶ 16–21; Decl. of Josh Fattal ¶¶ 19–24; Decl. of Shane Bauer ¶¶ 14–17.  "This Court and others have also recognized that Evin Prison is well-known for its inhumane conditions."  *Alinejad v. Islamic Republic of Iran*, 2023 WL 4684929, at *18 (D.D.C. July 6, 2023).

Upon their arrival at Evin prison, all three were placed in solitary confinement and squalid conditions: Shourd and Bauer were put in adjacent cells, Decl. of S. Shourd ¶ 24, Decl. of Shane Bauer ¶ 17, but Josh was placed in a cell elsewhere, Decl. of Josh Fattal ¶ 24.  Each prisoner's cell was 6–8 feet by 10–12 feet with only a bathroom and overhead light that remained on for 24 hours per day.  Decl. of S. Shourd ¶ 22; Decl. of Josh Fattal ¶ 25; Decl. of Shane Bauer ¶ 18.  Interrogations began when they arrived at the prison, but grew more sophisticated, with interrogators repeatedly trying to get the prisoners to admit to being U.S. spies.  Decl. of S. Shourd ¶¶ 25–26, 29–30; Decl. of Josh Fattal ¶¶ 22, 28–30; Decl. of Shane Bauer ¶ 25.  They could hear other prisoners being tortured and screaming.  Decl. of S. Shourd ¶ 24; Decl. of Josh Fattal ¶¶ 32, 53; Decl. of Shane Bauer ¶ 20.  After one month, the three prisoners were moved to a different part of the prison,

5

separated, and put in the same kind of cells (even smaller in Bauer's case).  Decl. of S. Shourd ¶ 28; Decl. of Josh Fattal ¶¶ 39–41; Decl. of Shane Bauer ¶¶ 24–25.  Eventually, they were allowed to spend 30 minutes together outside of their cells each day.  Decl. of S. Shourd ¶ 37.¶

Extensive solitary confinement, interrogation, and uncertainty caused severe psychological distress to all three prisoners.  The details of their long stays at Evin prison are numerous, but the following, brief summaries illuminate the horror of their experiences.

Shourd feared she would be raped or stuck in Evin prison forever.  Decl. of S. Shourd ¶ 23.  On one occasion, she was pushed up stairs and pushed into her cell.  Decl. of S. Shourd ¶ 21.  After one episode beating the walls in her cell and not realizing she was screaming at herself, she worried that she was permanently breaking.  Decl. of S. Shourd ¶¶ 35–36.  In September 2010, to leave, Shourd signed a sham indictment charging her with illegal entry and espionage.  Decl. of S. Shourd ¶¶ 47–48.  After all, as one interrogator had told her, she "was a political prisoner."  Decl. of S. Shourd ¶ 34.  In total, Shourd spent 410 days in solitary confinement before being released.  Shourd Br. 31.

Bauer was told to confess to being a spy or that he would remain in Evin for a very long time.  Decl. of Shane Bauer ¶ 22.  Yet, one interrogator told Bauer that he knew he was not a spy, but that it was up to the United States to negotiate his release.  Decl. of Shane Bauer ¶ 26.  After three months of solitary confinement, Bauer "began to feel that [he] was losing [his] mind" and became hopeless.  Decl. of Shane Bauer ¶ 27.  Fattal too had "felt reality slipping away from [him]."  Decl. of Josh Fattal ¶ 45.  Then guards moved Bauer to share Fattal's cell.  Decl. of Shane Bauer ¶ 28; Decl. of Josh Fattal ¶ 46.  However,

in such a small space for 23.5 hours a day, the shared cell posed its own difficulties for the men. Decl. of Josh Fattal ¶¶ 49, 57–58; Decl. of Shane Bauer ¶¶ 29–30.  The guards made life more difficult; they "prodded, poked, insulted, and goaded [Fattal] on a daily basis" and "started scuffles and physical fights with [him] and Shane."  Decl. of Josh Fattal ¶ 54. Bauer and Fattal's struggle continued for about two more years, cramped in that small cell with the light that remained on 24 hours a day, and "hearing the regular physical torture in nearby cells."  Decl. of Josh Fattal ¶ 53; Decl. of Shane Bauer ¶¶ 29, 34–35.  To make matters worse for Bauer, his health was deteriorating from a bleeding ulcer and anemia. Decl. of Shane Bauer ¶ 36.  In February 2011, Bauer and Fattal finally appeared before a judge and were charged with illegal entry and espionage.  Decl. of Josh Fattal ¶ 60; Decl. of Shane Bauer ¶ 37.  In August 2011, following a sham trial, Bauer and Fattal were convicted and each sentenced to eight years in prison.  Decl. of Shane Bauer ¶ 38; Decl. of Josh Fattal ¶ 67.  Then, in September 2011, after 782 days in Iranian custody, Shane and Bauer were released.  Decl. of Josh Fattal ¶ 68; Decl. of Shane Bauer ¶ 39.

Unfortunately, this story is familiar, as expert reports submitted in these cases by Dr. Mehdi Khalaji detail.  Shourd Br. Ex. 4, Mehdi Khalaji Expert Rpt., *Shourd*, No. 22-cv-1309 [Dkt. #16-5]; Fattal Br. Ex. 6, Mehdi Khalaji Expert Rpt., *Fattal*, No. 22-cv-2110 [Dkt. #17-7]; Bauer Br. Ex. 7, Mehdi Khalaji Expert Rpt., *Bauer*, No. 22-cv-2294 [Dkt. #17-9].  As Dr. Khalaji explains in her reports,[3] Iran has been engaging in hostage taking

---

[3] Dr. Khalaji is a senior fellow at the Washington Institute for Near East policy and a specialist on the behavior and politics of Iran and the Shiite community in the Middle East.  Mehdi Khalaji Expert Rpt. 1–2, *Shourd*, No. 22-cv-1309.  (For simplicity's sake, this citation and those following are to only one of Dr. Khalaji's reports because her findings and conclusions are the same as to each plaintiff.)  She has studied and trained in Iran, published many articles and reports on these subjects, and been consulted by the

since 1979 and "the Iranian regime has viewed hostage-taking as a matchless way of advancing its anti-American, anti-Western, pan-Islamist policy." Mehdi Khalaji Expert Rpt. 6, *Shourd*, No. 22-cv-1309. Yet, "The arrest, detention, isolation, abuse, mistreatment, and legal process described in Ms. Shourd's, Mr. Bauer's, and Mr. Fattal's complaints are contrary to Iranian law." *Id.* at 9. The Court accepts Dr. Khalaji's opinions and conclusions that "Iran's purpose and specific intent in this particular case was to arrest and detain Ms. Shourd, Mr. Bauer, and Mr. Fattal for the purpose of gaining greater leverage and exacting certain concessions from the United States in the context of ongoing negotiations." *Id.* at 13; *see Owens*, 864 F.3d at 785–87. The Court further accepts Dr. Khalaji's conclusion that "[g]iven the frequency and similar characteristics, the use of justice mechanisms controlled by the State to carry them out, and the control the regime exerts over such matters, there is no reasonable possibility that these acts occurred without the direction, participation, and approval of the Iranian government." Mehdi Khalaji Expert Rpt. 13–14, *Shourd*, No. 22-cv-1309; *see Owens*, 864 F.3d at 785–87.

B.      **Post-Imprisonment**

Shourd, Bauer, and Fattal have suffered lasting and ongoing psychological harm from their unjust and harrowing experiences at Evin prison. These three plaintiffs have submitted expert reports by Dr. Stuart Grassian, M.D., a board-certified psychiatrist, that attest to their lasting psychological suffering.[4] Dr. Grassian is certainly qualified to serve

---

White House, National Security Council, and the U.S. Departments of State and Defense on Iran-U.S. relations and Iran's nuclear policy. *Id.*

[4] Shourd Br. Ex. 3, Dr. Stuart Grassian Expert Rpt.: Psychiatric Rpt. re Sarah Shourd, *Shourd*, No. 22-cv-1309 [Dkt. #15-4]; Fattal Br. Ex. 5, Dr. Stuart Grassian Expert Rpt.: Psychiatric Rpt. re Joshua Fattal,

as an expert in this capacity: he has evaluated and treated patients in psychiatry for 50 years, served on the faculty for Harvard Medical School, and his work on the psychiatric effects of solitary confinement has been cited by numerous federal courts, including the United States Supreme Court.[5]    Accordingly, the Court adopts his testimony and professional opinions from his expert reports. *See Owens*, 864 F.3d at 785–87.

## IV.    ANALYSIS

### A.    Default Judgment

Plaintiffs are entitled to default judgment because this Court (1) "has subject matter jurisdiction over the claims, (2) personal jurisdiction is properly exercised over the defendant[], (3) the plaintiffs have presented satisfactory evidence to establish their claims against the defendants, and (4) the plaintiffs have satisfactorily proven that they are entitled to the monetary damages they seek." *Braun*, 228 F. Supp. 3d at 75.

#### 1.    Subject matter jurisdiction

This Court has subject matter jurisdiction under the FSIA's terrorism exception, 28 U.S.C. § 1605A(a).  "The terrorism exception applies when money damages are sought (1) from a 'foreign country [that] was designated a state sponsor of terrorism at the time of the act,' (2) by 'a national of the United States,' (3) after 'the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim,' (4) to compensate the claimant 'for personal injury or death caused by torture, extrajudicial killing, aircraft sabotage, hostage

---

*Fattal*, No. 22-cv-2110 [Dkt. #18-5].  Bauer Br. Ex. 6, Dr. Stuart Grassian Expert Rpt.: Psychiatric Rpt. re Shane Bauer, *Bauer*, No. 22-cv-2294 [Dkt. #18-6].
[5] *See supra* note 4.

taking, or the provision of material support or resources for such an act, if engaged in by

an official, employee, or agent of a foreign country.'" *Rezaian v. Islamic Republic of Iran*,

422 F. Supp. 3d 164, 175 (D.D.C. 2019) (quoting *Braun*, 228 F. Supp. 3d at 75).  These

first three conditions are easily satisfied here,[6] so only the fourth requires discussion.

Plaintiffs claim that Iran caused personal injury to Shourd, Bauer, and Fattal by means of

torture and hostage-taking.

"Regardless whether Iran's treatment of [Shourd, Bauer, and Fattal] was sufficiently

severe to constitute 'torture' under the FSIA, the uncontroverted evidence establishes that

Iran committed an act of hostage taking." *Saberi v. Gov't of Islamic Republic of Iran*, 541

F. Supp. 3d 67, 80 (D.D.C. 2021).  Under the FSIA, a "hostage taking" is when

> [a]ny person . . . seizes or detains and threatens to kill, to injure or to continue
> to detain another person . . . in order to compel a third party, namely, a State,
> an international governmental organization, a natural or juridical person, or
> a group of persons, to do or abstain from doing any act as an explicit or
> implicit condition for the release of the hostage . . . .

International Convention Against the Taking of Hostages, art. 1, Dec. 17, 1979, 1316

U.N.T.S. 205, 207 (incorporated by FSIA at 28 U.S.C. § 1605A(3)).  Here, one interrogator

told Shourd she "was a political prisoner."  Decl. of S. Shourd ¶ 34.  Another interrogator

told Bauer that he knew he was not a spy, but that it was up to the United States to negotiate

his release.  Decl. of Shane Bauer ¶ 26.  As noted, the Court accepts Dr. Khalaji's opinions

and conclusions that "Iran's purpose and specific intent in this particular case was to arrest

---

[6] First, Iran has been designated a state sponsor of terror since 1984.  *See State Sponsors of Terrorism*, U.S. Dep't of State, https://www.state.gov/state-sponsors-of-terrorism/.  Second, Plaintiffs are all U.S. Citizens.  *See supra* note 1.  Third, Plaintiffs provided Iran with the required opportunity for arbitration when they served them.  *See* Dkt. ##6, 11, *Shourd*; Dkt. ##8-1, 12, *Bauer*; Dkt. ##8, 12, *Fattal*; *Simpson v. Socialist People's Libyan Jamahiriya*, 326 F.3d 230, 233 (D.C. Cir. 2003).

and detain Ms. Shourd, Mr. Bauer, and Mr. Fattal for the purpose of gaining greater leverage and exacting certain concessions from the United States in the context of ongoing negotiations." Mehdi Khalaji Expert Rpt. 13, *Shourd*, No. 22-cv-1309; *see Owens*, 864 F.3d at 785–87.

Finally, the extreme mental and emotional injuries that Shourd, Bauer, and Fattal suffered were clearly "caused by" Iran. *See* 28 U.S.C. § 1605A(a)(1). Plaintiffs are only required to establish proximate cause. *See Owens*, 864 F.3d at 794. That standard "requires some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." *Roth v. Islamic Republic of Iran*, 651 F. Supp. 3d 65, 91 (D.D.C. 2023) (quoting *id.*). There is no question that there is a reasonable connection between Iran's hostage taking of Shourd, Bauer, and Fattal and the harm they suffered. *See* Medhi Khalaji Expert Rpt. 13–14, *Shourd*, No. 22-cv-1209; *Owens*, 864 F.3d at 785–87. Causation is clearly satisfied.

Accordingly, this Court has subject matter jurisdiction over Plaintiffs' claims under the terrorism exception to the FSIA.

### 2.    Personal jurisdiction.

Plaintiffs properly served Iran pursuant to § 1608(a)(4). *See supra* Part I. Therefore, Plaintiffs have properly exercised personal jurisdiction over defendant Iran.

### 3.    Establishment of claims

Because Plaintiffs have established subject matter jurisdiction under the FSIA's terrorism exception and are all U.S. citizens, they may use the FSIA's cause of action and "ha[ve] also established entitlement to relief as a matter of federal law." *Fritz v. Islamic*

*Republic of Iran*, 320 F. Supp. 3d 48, 86–87 (D.D.C. 2018); 28 U.S.C. § 1605A(c)(1).

### 4.    Entitlement to damages

Under § 1605A(c)'s federal cause of action, money damages include "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). Yet, "Section 1605A(c) . . . provides no guidance on the substantive bases for liability to determine plaintiffs' entitlement to damages. Consequently, courts have applied 'general principles of tort law,' such as the Restatement (Second) of Torts, to determine liability." *Braun*, 228 F. Supp. 3d at 78 (quoting *Est. of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 24 (D.D.C. 2009)) (collecting cases). Plaintiffs offer three tort-based theories as bases for liability: false imprisonment, assault and battery, and intentional infliction of emotional distress. Plaintiffs merit damages because Iran is indeed liable under these torts and their requested damages are "reasonable estimate[s]." *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 402 (D.D.C. 2015) (quoting *Salazar*, 370 F. Supp. 2d at 115–16). To determine reasonable estimates, this Court "look[s] to expert testimony and prior awards for comparable injury." *Braun*, 228 F. Supp. 3d at 82.

*First*, Plaintiffs are correct that Iran is liable for false imprisonment. "False imprisonment occurs when a defendant "'acts intending to confine [a person] within boundaries fixed by the actor,' [and] the action 'directly or indirectly results in such a confinement of the other,' and the plaintiff 'is conscious of the confinement or is harmed by it.'" *Rezaian*, 422 F. Supp. 3d at 179 (quoting *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 34 (D.D.C. 2001), *aff'd sub nom. Bettis v. Islamic Republic of Iran*, 315 F.3d 325 (D.C. Cir. 2003)). "Holding an innocent person hostage satisfies all of these

elements." *Id.*

*Second*, Plaintiffs are correct that Iran assaulted Shourd, Bauer, and Fattal because "(1) it acted 'intending to cause a harmful contact with . . ., or an imminent apprehension of such a contact' by, [Shourd, Bauer, and Fattal] and (2) [they] were 'thereby put in such imminent apprehension.'" *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 76 (D.D.C. 2010) (quoting Restatement (Second) of Torts § 21(1)).  Shourd, Bauer, and Fattal regularly heard fellow prisoners be tortured and were provided no assurances of their safety.  It is clear that forcing the three into prison at gunpoint, interrogating them, and keeping them guessing as to when or if it would be their turn for torture constitutes assault. *See id.*  The fact that guards had been physical with each prisoner only heightened the reasonableness of the prisoners' apprehension.  *See* Decl. of S. Shourd ¶ 21; Decl. of Josh Fattal ¶ 54.  It also means that Iran is liable for battery against Shourd, Bauer, and Fattal because (1) "it acted 'intending to cause a harmful or offensive contact with . . ., or an imminent apprehension of such a contact' by, [Shourd, Bauer, and Fattal] and (2) 'a harmful contact with' [them] 'directly or indirectly result[ed].'" *Valore*, 700 F. Supp. 2d at 77 (quoting Restatement (Second) of Torts § 13).

*Third*, Plaintiffs are correct that Iran is liable for intentional infliction of severe emotional distress ("IIED") as to all Plaintiffs.  Iran is liable for IIED because "by extreme and outrageous conduct[, it] intentionally or recklessly cause[d] severe emotional distress to" Shourd, Bauer, and Fattal.  *Id.* at 77 (quoting Restatement (Second) of Torts § 46(1)). Hostage taking, as an act of terrorism, satisfies an IIED claim's high standard because "acts of terrorism are by their very definition extreme and outrageous and intended to cause the

highest degree of emotional distress." *Id.* (quoting *Belkin v. Islamic Republic of Iran*, 667

F. Supp. 2d 8, 22 (D.D.C. 2009)).

### B.    Damages

Plaintiffs merit the following damages under the applicable standards discussed

*infra.*

### 1.    Economic damages

Plaintiffs with claims under the FSIA's private right of action may receive damages

awards for economic loss stemming from the injury or death of an immediate family

member if they "can establish those damages through 'competent evidence.'" *Force v.*

*Islamic Republic of Iran*, 617 F. Supp. 3d 20, 31 (D.D.C. 2022) (quoting *Moradi v. Islamic*

*Republic of Iran*, 77 F. Supp. 3d 57, 71 (D.D.C. 2015)).   Reports by forensic economists

based on "reasonable and well-founded assumptions" can provide a proper basis for

determining such awards.  *Reed*, 845 F. Supp. 2d at 214.  The standard for establishing

entitlement to economic damages (future harm) is proving entitlement to a reasonable

certainty, "(i.e., more likely than not)." *Hill v. Republic of Iraq*, 328 F.3d 680, 685 (D.C.

Cir. 2003).  Sarah Shourd, Josh Fattal, and Shane Bauer have each pleaded entitlement to

economic damages. *See* Compl. (Prayer for Relief), *Shourd*, No. 22-cv-1309; Compl.

(Prayer for Relief), *Fattal*, No. 22-cv-2110; Compl. (Prayer for Relief), *Bauer*, No. 22-cv-

2294.  However, they have not attempted to support a claim for economic damages at this

stage because they have not submitted any proof to establish economic damages.  In fact,

they are essentially silent on the topic in their briefing.  The Court cannot create economic

loss awards out of thin air, and thus cannot award economic damages here.

### 2.     Compensatory damages for pain and suffering

Sarah Shourd, Josh Fattal, and Shane Bauer, for surviving hundreds of days of imprisonment after being taken hostage, seek damages for pain and suffering for the time they were held hostage and post-release. *See Valore*, 700 F. Supp. 2d at 83. Pain and suffering are "reasonably certain to follow from hostage taking." *Rezaian*, 422 F. Supp. 3d at 180. "Courts 'in this district . . . typically set damages for prolonged and abusive captivity at $10,000 per day for the pain and suffering that victims experienced while imprisoned.'" *Id.* (quoting *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 163–64 (D.D.C. 2017). Shourd, Bauer, and Fattal each ask for awards for pain and suffering in captivity following this metric. Shourd Br. 29 (requesting $4,100,000 for 410 days of imprisonment; Bauer Br. 34 (requesting $7,820,000 for 782 days of imprisonment); Fattal Br. 34 (requesting $7,820,000 for 782 days of imprisonment). Such awards are appropriate.

Shourd, Bauer, and Fattal also each request $12,000,000 for post-release pain and suffering. Shourd Br. 32; Bauer Br. 34; Fattal Br. 37. No specific formula determines post-release damages. *Gidada v. Islamic Republic of Iran*, 2024 WL 3741438, at *2 (D.D.C. July 1, 2024). Instead, when calculating post-release damages, "courts routinely consider (1) the 'length and severity' of the plaintiff's torture and detention; (2) the 'extent of the plaintiff's lasting physical and mental injuries;' and (3) the plaintiff's 'age at the time of release' as well as 'the estimated number of years that the plaintiff can be expected to suffer from these injuries.'" *Saberi*, 541 F. Supp. 3d at 83 (quoting *Azadeh v. Gov't of*

*Islamic Republic of Iran*, 2018 WL 4232913, at \*19 (D.D.C. Sept. 5, 2018)).  Additionally, courts look to awards in similar cases for guidance.  *Id.*

Here, it is useful to consider three FSIA cases where hostages were also held at, and released from, Evin prison.  In *Hekmati v. Islamic Republic of Iran*, the court awarded $10 million in post-release damages to a plaintiff who was held hostage for 1,602 days (sometimes in solitary confinement), tortured, and 32 years old when released.  278 F. Supp. 3d at 150–55, 164.  In *Saberi v. Government of Islamic Republic of Iran*, the court, without making any finding regarding torture, awarded $9 million to a plaintiff who was held hostage at Evin prison for 100 days (partially in solitary confinement) and 32 years old when released.  541 F. Supp. 3d at 79–84.  In *Rezaian*, the court awarded plaintiff $10 million after he was held hostage for 544 days (partially in solitary confinement), tortured, and almost 40 years old when released.  422 F. Supp. 3d at 180.

Shourd, Bauer, and Fattal's confinements are closest to the plaintiff in *Rezaian*, but their treatments are closest to the plaintiff in *Saberi*.  Shourd's age upon release (32 years old) was the same as the plaintiff in *Saberi*, while Bauer and Fattal were both 29 years old upon release.  Shourd, Bauer, and Fattal have all struggled with post-traumatic stress syndrome since being released.[7]  Considering the relevant factors alongside awards in other cases as guidance, I award $9,000,000 to each Shourd, Bauer, and Fattal in post-release damages for pain and suffering.

---

[7] *See supra* note 4.

### 3.    Solatium

Plaintiffs who are family members of victims may recover damages known as solatium claims for the emotional injuries they suffer from harm to their relations. *Valore*, 700 F. Supp. 2d at 83. Solatium awards are thus available to: Nora Shourd as victim Sarah Shourd's mother; Cindy Fischer and Al Bauer as victim Shane Bauer's parents, and Nicole Lindstrom and Shannon Bauer as his sisters; and Laura Fattal and Jacob Fattal, as victim Josh Fattal's parents, and Alex Fattal as his brother. The severity of a family member's pain and nature of his or her relationship with the victim determines solatium damages. *See Est. of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006). In our Circuit, courts consider a standardization known as the *Heiser* damages framework to determine solatium awards. *See id.*

The *Heiser* framework provides guidelines for damages of "approximately $5 million to a parent whose child was killed and approximately $2.5 million to a plaintiff whose sibling was killed." *Id.* (footnote omitted). When a plaintiff's victim-relation suffers non-fatal injuries, such as here, courts generally award half of what family members would receive if the victim had died. *See Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 39 (D.D.C. 2012). Courts "deviate upwards where the 'circumstances surrounding the terrorist attack [make] the suffering particularly more acute or agonizing.'" *Fields v. Syrian Arab Republic*, 2021 WL 9244135, at *15 (D.D.C. Sept. 29, 2021) (quoting *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26–27 (D.D.C. 2011)).

All family members here are immediate family members, parents or siblings, who have submitted affidavits attesting to their close relationships and pain from Iran's hostage

taking of their loved ones.[8]   Each parent in these cases requests $2.5 million awards (standard for parents of surviving victim-children) for his or her pain and suffering during the prisoners' period of captivity and from witnessing its effects on their lives.   All siblings here request $1.25 million awards each for their pain and suffering from the same causes (standard for siblings of surviving victims).   All siblings also request a 25% upward deviation.

These standard awards are clearly merited.  *See Rezaian*, 422 F. Supp. 3d at 180. Further, Plaintiffs show these hostage takings had similarly profound impacts on the lives of both the parents and siblings in this case.   Therefore, I award *all* family members upward variations of 25% from the standard solatium awards because the circumstances surrounding hostage taking do render "the suffering particularly more acute or agonizing" than those of a singular attack.  *See Oveissi*, 768 F. Supp. 2d at 26–27.   The knowledge that loved ones are alive and could at the same time potentially be killed or released breeds a torturous combination of fear and hope.   Further, it spurs the feeling that one can and must do something to change the situation and improve a loved one's odds of release.   That is exactly what these affidavits detail: parents and siblings alike saw their lives come to a halt and their entire focus and job became raising awareness and campaigning to get their loved ones released.

### 4.      Punitive damages

Courts may award punitive damages under 28 U.S.C. § 1605A(c) to "punish

---

[8] *See supra* note 1 (compiling affidavits of all Plaintiffs).

outrageous behavior and deter such outrageous conduct in the future." *Oveissi*, 879 F. Supp. 2d at 55–56. Defendant's conduct here was clearly outrageous. As other courts have noted, consistently targeting, falsely imprisoning, and severely mistreating American citizens by holding them hostage, constitutes outrageous conduct that makes punitive damages appropriate. *See Rezaian*, 422 F. Supp. 3d at 183; *Hekmati*, 278 F. Supp. 3d at 166. To calculate appropriate punitive damages, "courts consider (1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Rezaian*, 422 F. Supp. 3d at 183 (quoting *Braun*, 228 F. Supp. 3d at 86).

Courts have used various methods to calculate punitive damages in our Circuit, including: (1) multiplying a foreign state's annual expenditures in support of terrorism; (2) applying a ratio of punitive to compensatory damages that previous cases assessing similar conduct have used; and (3) "award[ing] a fixed amount of $150,000,000 per victim." *Thuneibat*, 167 F. Supp. 3d at 53–54. Fixed amount awards of this size are sometimes more appropriate for deadlier terrorism attacks, *see Frost v. Islamic Republic of Iran*, 419 F. Supp. 3d 112, 117 (D.D.C. 2020), but not unprecedented in hostage taking situations, *see Rezaian*, 422 F. Supp. 3d at 183–84 (awarding $150,000,000 in punitive damages for each affected family). The relevant factors support sizable, fixed awards here: (1) the character of the act is horribly unjust and shows complete disregard for international law and human life; (2) the nature and extent of the harm is permanent psychological damage; (3) the need for deterrence is immense since this practice has been ongoing and is continuing; and (4) Iran has great wealth. Accordingly, I award punitive damages of

$150,000,000 per family (totaling $450,000,000), apportioned among each group of plaintiffs in proportion to their award of compensatory damages. *See Fields*, 2021 WL 9244135, at *17.

### 5.    Prejudgment interest

Plaintiffs request prejudgment interest on their awards. Compl. (Prayer for Relief), *Shourd*, No. 22-cv-1309; Compl. (Prayer for Relief), *Fattal*, No. 22-cv-2110; Compl. (Prayer for Relief), *Bauer*, No. 22-cv-2294. Prejudgment interest only applies to the economic loss awards, and not pain and suffering, solatium, or punitive damages. *See Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 232 (D.D.C. 2012), *aff'd*, 554 F. App'x 16 (D.C. Cir. 2014); *Fields*, 2021 WL 9244135, at *17. Because there are no economic loss awards in these cases, Plaintiffs' request for pre-judgment interest is moot and thus denied.

## V.    Conclusion

For the reasons above, I **GRANT** these motions for default judgment and award damages consistent with this memorandum opinion and as specified in Appendix A.

RICHARD J. LEON
United States District Judge

# APPENDIX A
## Damages

| Case No. | Plaintiff | Relationship | Pain & Suffering | Solatium | Punitive Damages | TOTAL |
|---|---|---|---|---|---|---|
| 22-cv-1309 | Sarah Shourd | Victim | $13,100,000 | | $121,109,399.08 | **$134,209,399.08** |
| | Patricia "Nora" Shourd | Victim's Mother | | $3,125,000 | $28,846,153.85 | **$31,971,154.85** |
| 22-cv-2294 | Shane Bauer | Victim | $16,820,000 | | $96,316,090.86 | **$113,136,091.86** |
| | Cindy Fisher | Victim's Mother | | $3,125,000 | $17,894,636.38 | **$21,019,636.38** |
| | Al Bauer | Victim's Father | | $3,125,000 | $17,894,636.38 | **$21,019,636.38** |
| | Nicole Lindstrom | Victim's Sister | | $1,562,500 | $8,947,318.19 | **$10,509,818.19** |
| | Shannon Bauer | Victim's Sister | | $1,562,500 | $8,947,318.19 | **$10,509,818.19** |
| 22-cv-2294 | Joshua Fattal | Victim | $16,820,000 | | $102,425,657.16 | **$119,245,657.16** |
| | Laura Fattal | Victim's Mother | | $3,125,000 | $19,029,737.14 | **$22,154,737.14** |
| | Jacob Fattal | Victim's Father | | $3,125,000 | $19,029,737.14 | **$22,154,737.14** |
| | Alex Fattal | Victim's Brother | | $1,562,500 | $9,514,868.57 | **$11,077,369.57** |